UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CORNELIUS RIVERS,<br><br>Defendant | Criminal No. 25cr10068<br><br>Violations:<br><br><u>Count One</u>: Conspiracy to Commit Honest Services Mail Fraud<br>(18 U.S.C. § 1349)<br><br><u>Count Two</u>: Conspiracy to Commit Extortion<br>(18 U.S.C. § 1951)<br><br><u>Forfeiture Allegation</u>:<br>(18 U.S.C. § 981(a)(1)(C) and<br>28 U.S.C. § 2461) |

<u>INFORMATION</u>

At all times relevant to this Information:

<u>General Allegations</u>

1. Defendant CORNELIUS RIVERS was a resident of Stoughton, Massachusetts.

2. The Massachusetts Registry of Motor Vehicles ("RMV") was an organization within the Massachusetts Department of Transportation. The RMV did business in and affecting interstate commerce.

3. RIVERS worked as a road test examiner at the RMV service center in Brockton, Massachusetts. RIVERS owed a duty of honest services to the RMV and the Commonwealth to perform his job and official duties free from fraud, deceit, and self-enrichment and to refrain from accepting bribes and kickbacks.

4. The person identified herein as "Co-Conspirator 1" was the owner and president

of a driving school in Brockton, Massachusetts.

5.	The person identified herein as "Co-Conspirator 2" was the Manager in charge of the RMV service center in Brockton and a friend of RIVERS.

<u>The Process to Obtain a Massachusetts Class D Driver's License</u>

6.	A Massachusetts Class D driver's license authorizes a Massachusetts resident to drive a passenger car and certain other motor vehicles weighing not more than 26,000 pounds. Class D licenses are issued by the RMV.

7.	Before a resident may apply for a Class D license, they must obtain a Class D learner's permit. They must then complete the road test application and pay a fee to take a road test at an RMV service center. The road test must be conducted by an RMV road test examiner, who sits in the passenger seat while the applicant is in the driver's seat.

8.	The road test requires the applicant to, among other things, parallel park, perform a three-point turn, back up in a straight line for at least 25 yards, and drive on roads outside the RMV parking lot.

9.	The road test examiner determines whether the applicant has passed or failed their road test. The examiner notes in the RMV computer system whether the applicant has passed or failed.

10.	If the applicant passes their road test and pays the license fee, the RMV's computer system authorizes the issuance of a Class D license. The RMV's authorization is automatically relayed by computer to an outside vendor, which manufactures the Class D license and sends it to the licensee via U.S. mail.

<u>Overview of the Conspiracy to Commit Honest Services Mail Fraud</u>

11. From at least as early as in or about August 2019 through in or about April 2021, Co-Conspirator 1 accepted payments from or on behalf of the holders of Class D learner's permits and then paid RIVERS cash bribes and kickbacks in exchange for RIVERS falsely representing to the RMV that those permittees had passed their Class D road tests.

12. Some permittees took a perfunctory road test. Others did not take a road test at all.

13. The RMV, unaware of the fraud, authorized the issuance of Class D licenses for these permittees.

14. These permittees later received their Class D licenses in the mail.

15. During the period of the conspiracy, RIVERS accepted a total of approximately $20,000 to $30,000 cash in bribe and kickback payments from Co-Conspirator 1.

<u>Object and Purpose of the Conspiracy to Commit Honest Services Mail Fraud</u>

16. The object of the conspiracy to commit honest services mail fraud was to defraud the RMV by causing it to issue Class D driver's licenses to individuals who had not taken and passed the road test. The purpose of the conspiracy was for RIVERS and Co-Conspirator 1 to enrich themselves personally.

<u>Manner and Means of the Conspiracy to Commit Honest Services Mail Fraud</u>

17. Among the manner and means by which RIVERS, Co-Conspirator 1, and others known and unknown to the Acting United States Attorney (the "United States Attorney") carried out the conspiracy to commit honest services mail fraud were the following:

    a. Accepting cash bribes and kickbacks from Co-Conspirator 1 in exchange for RIVERS's official assistance; and

    b. RIVERS falsely recording in the RMV computer database that certain permittees had passed their road tests.

<u>Acts in Furtherance of the Conspiracy to Commit Honest Services Mail Fraud</u>

18. RIVERS, Co-Conspirator 1, and others known and unknown to the United States Attorney committed and caused to be committed the following acts, among others, in furtherance of the conspiracy to commit honest services mail fraud:

### *Individual A*

    a. On or shortly before September 3, 2019, Co-Conspirator 1 collected approximately $400 from a friend of "Individual A" to assist Individual A in obtaining a Class D license.

    b. On or about September 3, 2019, RIVERS accepted approximately $100 to $200 cash from Co-Conspirator 1 in exchange for falsely representing to the RMV that Individual A had taken and passed the Class D road test.

    c. On or about September 3, 2019, RIVERS falsely noted in RMV's computer system that Individual A had taken and passed the road test. In fact, Individual A had not taken and passed the road test.

### *Individual B*

    d. On or shortly before January 3, 2020, Co-Conspirator 1 collected approximately $100 cash from "Individual B" to assist Individual B in obtaining a Class D license.

    e. On or about January 3, 2020, RIVERS accepted approximately $100 to $200 cash from Co-Conspirator 1 in exchange for falsely representing to the RMV

that Individual B had taken and passed the Class D road test.

f. On or about January 3, 2020, RIVERS falsely noted in RMV's computer system that Individual B had taken and passed the road test. In fact, Individual B had not taken and passed the road test.

### *Individual C*

g. On or shortly before January 23, 2020, Co-Conspirator 1 collected between approximately $200 and approximately $300 cash from "Individual C" to assist Individual C in obtaining a Class D license.

h. On or about January 23, 2020, RIVERS accepted approximately $100 to $200 cash from Co-Conspirator 1 in exchange for falsely representing to the RMV that Individual C had taken and passed the Class D road test.

i. On or about January 23, 2020, RIVERS falsely noted in RMV's computer system that Individual C had taken and passed the road test. In fact, Individual C had not taken and passed the road test.

### *Individual D*

j. On or shortly before January 23, 2020, Co-Conspirator 1 collected approximately $550 cash from "Individual D" to assist Individual D in obtaining a Class D license.

k. On or about January 23, 2020, RIVERS accepted approximately $100 to $200 cash from Co-Conspirator 1 in exchange for falsely representing to the RMV that Individual D had taken and passed the Class D road test.

l. On or about January 23, 2020, RIVERS falsely noted in RMV's computer

system that Individual D had taken and passed the road test. In fact, Individual D had not taken and passed the road test.

### *Individual E*

m. On or shortly before January 23, 2020, Co-Conspirator 1 collected between approximately $150 and approximately $500 cash from "Individual E" to assist Individual E in obtaining a Class D license.

n. On or about January 23, 2020, RIVERS accepted approximately $100 to $200 cash from Co-Conspirator 1 in exchange for falsely representing to the RMV that Individual E had taken and passed the Class D road test.

o. On or about January 23, 2020, RIVERS falsely noted in RMV's computer system that Individual E had taken and passed the road test. In fact, Individual E had not taken and passed the road test.

<u>The Process to Obtain a Massachusetts Commercial Learner's Permit</u>

19. The RMV issues commercial driver's licenses ("CDLs"). A Massachusetts resident is required to obtain a CDL in order to drive a commercial vehicle, such as a tractor-trailer or a tanker truck.

20. Before applying for a CDL, an applicant must obtain a commercial learner's permit ("CLP"). Only after obtaining a CLP may a person apply to take the road test required for the CDL.

21. Getting a CLP requires taking multiple-choice tests in person at an RMV service center. Every CLP applicant must pass the commercial vehicle "General Knowledge" test. If the applicant also wants a particular endorsement on their CDL, *e.g.*, an endorsement to drive a

commercial vehicle containing hazardous materials, they are required to take and pass that endorsement test in person at an RMV service center.

22.     CLP applicants are required to answer 80% of questions correctly in order to pass each test. For example, an applicant must correctly answer 40 of the 50 questions on the General Knowledge test.

23.     Ordinarily, applicants take CLP tests on computers set up in a room at the RMV. The tests are scored by the computer.

24.     However, an applicant may ask to take the tests on paper. At all times relevant to this Information, paper CLP tests taken at the Brockton RMV were scored by Co-Conspirator 2.

### CLP Applicant's Tests

25.     The person identified herein as "CLP Applicant" was a friend of RIVERS.

26.     On or before October 21, 2019, RIVERS offered to help CLP Applicant pass their CLP tests. RIVERS told CLP Applicant to go the Brockton RMV service center and ask to take the tests on paper.

27.     On or before October 21, 2019, CLP Applicant told RIVERS that they planned to go to the Brockton RMV on October 21, 2019 to take their tests.

28.     On or about October 21, 2019, RIVERS paid Co-Conspirator 2 approximately $200 cash in exchange for Co-Conspirator 2 agreeing to score CLP Applicant as having passed their CLP tests regardless of whether CLP Applicant actually passed. RIVERS and Co-Conspirator 2 knew the money was not due to Co-Conspirator 2.

29.     On or about October 21, 2019, CLP Applicant went to the Brockton RMV to take the General Knowledge test and two endorsement tests. CLP Applicant asked to take the tests on

paper.

30. After CLP Applicant completed the three paper tests and turned them in, Co-Conspirator 2 scored them in their office.

31. Even though CLP Applicant failed the General Knowledge test by answering only 33 questions correctly, Co-Conspirator 2 scored CLP Applicant as having answered 41 questions correctly and therefore having passed the test.

32. Co-Conspirator 2 falsely represented to the RMV that CLP Applicant had passed all three tests. As a result, the RMV issued a CLP to CLP Applicant.

<u>Object and Purpose of the Conspiracy to Commit Extortion</u>

33. The object of the conspiracy to commit extortion was for RIVERS to provide property to Co-Conspirator 2 which was not due to Co-Conspirator 2, in exchange for Co-Conspirator 2 using their position as the Manager of the Brockton RMV to score CLP Applicant as having passed their CLP tests whether or not CLP Applicant actually passed. The purpose of the conspiracy was for RIVERS to benefit by obtaining guaranteed passing scores for CLP Applicant, and for Co-Conspirator 2 to be enriched personally.

<u>Manner and Means of the Conspiracy to Commit Extortion</u>

34. Among the manner and means by which RIVERS, Co-Conspirator 2, and others known and unknown to the United States Attorney carried out the conspiracy to commit extortion were the following:

   a. RIVERS instructing CLP Applicant to go the Brockton RMV Service Center and ask to take the CLP permit tests on paper; and

   b. RIVERS paying Co-Conspirator 2 in exchange for Co-Conspirator 2 agreeing

to give CLP Applicant passing scores on their CLP tests whether or not they actually passed.

COUNT ONE
Conspiracy to Commit Honest Services Mail Fraud
(18 U.S.C. § 1349)

The United States Attorney charges:

35. The United States Attorney re-alleges and incorporates by reference paragraphs 1-18 of this Information.

36. From at least as early as in or about August 2019 through in or about April 2021, in the District of Massachusetts, and elsewhere, the defendant,

CORNELIUS RIVERS,

conspired with Co-Conspirator 1 and others known and unknown to the United States Attorney to commit honest services mail fraud, that is, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and to deprive the RMV and the Commonwealth of Massachusetts of their right to RIVERS's honest and faithful services, through bribes and kickbacks, did knowingly cause Massachusetts Class D driver's licenses to be delivered by mail and by any private and commercial interstate carrier according to the direction thereon, for the purpose of executing the scheme.

All in violation of Title 18, United States Code, Sections 1341, 1346, and 1349.

## COUNT TWO
Conspiracy to Commit Extortion
(18 U.S.C. § 1951)

The United States Attorney further charges:

37.　　The United States Attorney re-alleges and incorporates by reference paragraphs 19-34 of this Information.

38.　　Between a date no later than October 21, 2019, and October 21, 2019, in the District of Massachusetts, and elsewhere, the defendant,

## CORNELIUS RIVERS,

conspired with Co-Conspirator 2 and others known and unknown to the United States Attorney to obstruct, delay, and affect, and attempt to obstruct, delay, and affect, in any way and degree, commerce and the movement of any article and commodity in commerce, by extortion, as that term is defined in Title 18, United States Code, section 1951; that is, by giving Co-Conspirator 2 property which was not due to Co-Conspirator 2 in exchange for Co-Conspirator 2 committing an official act under color of official right.

All in violation of Title 18, United States Code, Section 1951.

<u>FORFEITURE ALLEGATION</u>
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

The United States Attorney further alleges:

1. Upon conviction of one or more of the offenses in violation of Title 18, United States Code, Sections 1349 and 1951, set forth in Counts One and Two, the defendant,

CORNELIUS RIVERS,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense. The property to be forfeited includes, but is not limited to, the following asset:

    a. $26,200 to be entered in the form of a forfeiture money judgment.

2. If any of the property described in Paragraph 1, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendant --

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 1 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

JOSHUA S. LEVY
ACTING UNITED STATES ATTORNEY

By: *[signature]*
CHRISTINE WICHERS
ADAM W. DEITCH
Assistant U.S. Attorneys

Date: August 6, 2024